IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

DIANA PENTECOST,
on behalf of B.R.A., a minor                              PLAINTIFF

V.                                    NO. 10-3102

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration        DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Diana Pentecost, brings this action on behalf of her minor daughter, B.A.,

seeking judicial review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of

the Social Security Administration (Commissioner) denying B.A.'s application for child's

supplemental security income (SSI) benefits under Title XVI of the Social Security Act (Act).

I.      **Procedural Background:**

Plaintiff protectively filed the application for SSI on B.A.'s behalf on July 16, 2008,

alleging that B.A. was disabled due to compulsive disorder and ADHD (Attention Deficit

Hyperactivity Disorder). (Tr. 123, 127).  An administrative hearing was held on April 27, 2010,

at which Plaintiff and B.A. testified.  (Tr. 35-61).  Plaintiff was represented by counsel.

The ALJ, in a written decision dated June 24, 2010, found that B.A. had the following

severe impairments - depression, learning disability, and ADHD.  (Tr. 15).  However, the ALJ

further found that as B.A. did not have an impairment or combination of impairments that was

medically or functionally equal to a listed impairment, B.A. was not disabled.  (Tr. 15).

Plaintiff then requested a review of the hearing decision by the Appeals Council which

-1-

denied that request on September 8, 2010.  (Tr. 1-4).  The Appeals Council also ordered that

medical records from Mercy Medical Center dated September 4, 1995 through September 29,

2002, be made part of the record.  (Tr. 5).  Subsequently, Plaintiff filed this action.  (Doc. 1).

Both parties have consented to the case being decided by the undersigned.  (Doc. 5).  Briefs have

been filed by the parties and the matter is now ripe for determination.  (Docs. 8, 9).

## II.    Evidence Presented:

Plaintiff's daughter, B.A., was born in California in 1995.  (Tr. 123).  In 1999, B.A. was

placed in foster care in California, along with her three siblings.  (Tr. 334).  She was returned to

the custody of her mother soon thereafter.  (Tr. 333).  In 2001, when B.A. was six years old, she

fell and struck her head against the corner of a dumpster, sustaining a laceration to the forehead

through the right eyebrow.  (Tr. 444).  There was no loss of consciousness reported, and five

stitches were administered.  (Tr. 444).  She was assessed with a closed head injury and a 2.5 cm

facial laceration with intermediate closure.  (Tr. 446).

On October 31, 2006, when B.A. was eleven years old, she was referred to the UAMS

Department of Pediatrics - Arkansas Foster Care, for a comprehensive evaluation due to

placement in foster care in Arkansas.  (Tr. 292-302, 382-387).  B.A. had been placed in foster

care on September 20, 2006 due to her caretaker (temporary guardian) allegedly being "unable

to cope."  (Tr. 292).  B.A. and her three siblings were then residing at Florence Crittenden group

home.  (Tr. 292).  Plaintiff, B.A.'s mother, testified at the hearing that the children were removed

from the home because they went to visit Plaintiff's older daughter in Camden, Arkansas, and

B.A.'s younger sister had a problem with a "failure to thrive," so she was showing signs of

malnourishment at her daughter's house.  "They took her to the doctor and they tried to say that

I starved her." (Tr. 44). In the evaluation at UAMS, it was reported that B.A.'s strengths were that she was cooperative; attempted each task presented; and was attentive to instructions. (Tr. 295).

On November 6, 2007, B.A. began receiving treatment at DaySpring Behavioral Health Services ("DaySpring"). (Tr. 237). It was reported that B.A. recently returned home with her three siblings from foster care. (Tr. 237). It was also reported that the Department of Human Services case remained open, and that B.A.'s environment was still unsuitable - seven people lived in a two-bedroom trailer, and it was noted that there was no space or privacy for any of the children. (Tr. 237). B.A. and her siblings were reported as fighting constantly, her parents were reported as being mildly mentally retarded and had extreme difficulty parenting. (Tr. 237). B.A.'s hygiene was reported as being "poor." It was reported that B.A. was teased at school, felt nervous and was awkward around peers. B.A. reported she felt angry a lot, depressed sometimes, wanted to be left alone sometimes, cursed and fought with her parents, would physically fight with her siblings, but was good and compliant at school. (Tr. 237). The report further states that there "remains a risk of B.A. and her siblings going into foster care, and that is something B.A. expresses as a 'constant worry.'" (Tr. 237). The report revealed that B.A. was sexually abused by her brother who was in a group home for sex offenders, and was also inappropriately touched by a foster dad one time. (Tr. 237).

A psychiatric evaluation conducted at DaySpring reflected the following diagnosis:

| | |
|---|---|
| Axis I: | Sexual abuse of a child |
| | Disruptive behavioral d/o nos |
| Axis II: | Defer |
| Axis III: | No |
| Axis IV: | Primary support group; social environment; economic; education; |

<div style="margin-left:2em">housing</div>

Axis V:        Current GAF - 49

(Tr. 215).

When B.A. was in the 6th grade, in April of 2008, an Arkansas Augmented Benchmark Examination was conducted. (Tr. 171-174, 289-291). The evaluation revealed that B.A. ranked in the 32nd percentile in mathematics problem solving; 10th percentile in reading comprehension; and 24th percentile in comprehensive language. (Tr. 172-173).

On May 1, 2008, in a 90 day review at DaySpring, B.A. was diagnosed as follows:

| | |
|---|---|
| Axis I: | 312.9 - Disruptive behavior disorder |
| | 995.53 - Sexual abuse of child |
| Axis II: | No diagnosis |
| Axis III: | None |
| Axis IV: | Primary support group |
| | Educational |
| | Economic |
| | Other psychosocial and environmental problems |
| Axis V: | Current GAF - 55; Highest GAF - 57 |

(Tr. 216). It was noted that B.A. had anger outbursts, deviance, opposition, would not comply with parental requests, but "deviance at home only." (Tr. 217). It was also reported that B.A. was not entirely able to use self-time-out as an effective tool "due to the set up of her home environment - no privacy or space, and family members do not respect each other's need for space." (Tr. 218).

A Teacher Questionnaire was completed by Kirby Childress on September 4, 2008, when B.A. was in the seventh grade. (Tr. 134-141). Teacher Childress reported knowing B.A. for two years and saw her every day at school. With respect to the relevant domains of functioning, Teacher Childress reported:

1. Acquiring and Using Information - B.A. has a **slight problem** understanding and

<div style="text-align:center">-4-</div>

participating in class discussions and providing organized oral explanations and adequate descriptions.

2. Attending and Completing Tasks - **No problems** observed in this domain; functioning appears age-appropriate.

3. Interacting ant Relating with Others - **No problems** observed in this domain; functioning appears age-appropriate. It has not been necessary to implement behavior modification strategies for the child.

4. Moving about and Manipulating Objects - **No problems** observed in this domain; functioning appears age-appropriate.

5. Caring for Herself -B.A. has a **slight problem** handling frustration appropriately; taking care of personal hygiene; and caring for physical needs (e.g. dressing, eating).

6. Medical Conditions and Medications/Health and Physical Well-Being - "I don't know about medication!"

(Tr. 136-140)(emphasis added).

On December 19, 2008, an Intellectual Assessment and Adaptive Functioning Assessment was conducted by Nancy A. Bunting, Ph.D., Licensed Clinical Psychologist. (Tr. 259-262). In the assessment, Dr. Bunting reported that B.A.'s mother reported no concerns with B.A. except that because the family moved in November, B.A. had been taken out of her special education classes since those were not available in the new school district. (Tr. 259). B.A. reported to Dr. Bunting that her appetite was good, her weight was stable, her sleep was good and that she slept at least 10 hours daily. (Tr. 259). She also reported that her energy level was good and that with her medication, her attention was good. Dr. Bunting reported that B.A.'s mother felt that B.A. was "compulsive" because she would check to see if all of the family members were present. However, Dr. Bunting reported that considering that B.A. had just returned from 1 ½ years in foster care one month prior, "this does not seem peculiar." (Tr. 260).

She also reported that B.A. bit her nails, cried easily, lied, and sometimes rocked when standing. (Tr. 260). B.A.'s mother reported to Dr. Bunting that B.A. was taking the following medications regularly, had no problems with them, and that they "do seem to help:"  Focalin; Lexapro; and Trazodone. (Tr. 260). Dr. Bunting reported that B.A. lived with her 41 year old mother, her 48 year old stepfather, her 12 year old full brother, her 11 year old full sister, and her 14 year old half-sister. (Tr. 260). She reported that B.A. repeated kindergarten and was placed in "Team 3" special education classes beginning in the 6th grade. (Tr. 260). She transferred one month prior and was in the 7th grade at Norfork High School. (Tr. 260). Dr. Bunting found that B.A. was casually and appropriately groomed;  her hygiene and gait were unremarkable;  her mood was pleasant, though her facial expression was often one of worry;  her train of thought was logical and goal directed;  she was able to follow direction;  she was alert, attentive, and cooperative;  her level of effort on the tests was good as was her persistence;  her concentration was adequate for the testing situation;  and her pace was within normal limits. (Tr. 261). Dr. Bunting reported that B.A.'s full scale IQ of 81 fell in the low average range of intellectual functioning.  Dr. Bunting diagnosed B.A. as follows:

| | |
|---|---|
| Axis I: | Attention-deficit hyperactivity disorder |
| Axis II: | No diagnosis |
| Axis III: | Unremarkable |
| Axis IV: | Moderate |
| Axis V: | GAF 50-60 |

(Tr. 261-262). She believed that B.A. probably met the criteria for reading and mathematics disorder, given that she was functioning at the fourth grade level and was in the 7th grade. (Tr. 262). She further found that B.A. communicated and interacted in an age appropriate manner;  had the capacity to cope with typical mental/cognitive demands of school tasks on her

AO72A
(Rev. 8/82)

medication; was able to attend and sustain her concentration in the testing session and interview

and appeared able to do this in everyday situations when she was on her medication;  was able

to persist in the structured, supervised testing situation and appeared able to do this on her

medication;  and appeared able to complete work like tasks within an acceptable time frame.

(Tr. 262).

On December 30, 2008, Stephen A. Whaley completed a Childhood Disability Evaluation

Form.  (Tr. 252-257).  Dr. Whaley assessed B.A. with ADHD and Learning Disorder, and

concluded that B.A.'s impairment or combination of impairments was severe, but did not meet,

medically equal, or functionally equal the listings.  (Tr. 252).  Dr. Whaley found as follows with

regard to the domain evaluations:

1.  Acquiring and Using Information - **Less than marked**
2.  Attending and Completing Tasks - **Less than marked**
This claimant has a diagnosis of ADHD and is treated medically.   Claimant's concentration, persistence and pace appear reasonably normalized on medication.
3.  Interacting and Relating with Others - **No limitation**
4.  Moving About and Manipulating Objects - **No limitation**
5.  Caring for Yourself - **No limitation**
6.  Health and Physical Well-Being - **No limitation**

(Tr. 254-255)(emphasis added).

On February 3, 2009, neuropsychological evaluation was performed by Vann Smith.  (Tr.

267-271).  Dr. Smith indicated that medical records were being requested for review.  (Tr. 267).

Dr. Smith diagnosed B.A. with:

| | |
|---|---|
| Axis I: | Cognitive Dysfunction, Non-Psychotic, Secondary to General Medical Conditions(s) |
| | *TBI (traumatic brain injury) with Grade II concussion |
| | *R/O Complex Partial Seizure Variant |
| Axis II: | None |
| Axis III: | TBI, R/O seizure d/o |

-7-

Axis IV:        illegible
Axis V:         Current GAF-45; 45 highest GAF previously - 75-80

(Tr. 271-272).

On May 8, 2009, Dr. William Collie completed a Childhood Disability Evaluation Form, and reported that B.A.'s attendance and recent grades had not been returned after appropriate intervals and there was not enough information to rate the case. Therefore, Dr. Collie gave a technical denial. (Tr. 362).

On June 3, 2009, a Teacher Questionnaire was completed by Toni Damby, one of B.A.'s 7th grade teachers. (Tr. 175-192). Teacher Damby reported that she had B.A. in her literacy class off and on for two years when she was enrolled in Mountain Home school. (Tr. 175). She reported that B.A. was going into the 8th grade, and that her current reading level and written language level was 6th grade. (Tr. 175). She reported an "unusual degree of absenteeism." (Tr. 175). Teacher Damby evaluated the domains as follows:

1. Acquiring and using information - **No problems** observed in this domain; functioning appears age-appropriate.

2. Attending and Completing Tasks - **No problems** observed in this domain; functioning appears age-appropriate

3. Interacting and Relating with Others - B.A. has an **"obvious problem"** playing cooperatively with children; relating experiences and telling stories; and interpreting meaning of facial expression, body language, hints, and sarcasm. B.A. has a **"slight problem"** using language appropriate to the situation and listener; taking turns in a conversation; and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. B.A. has a **"serious problem"** making and keeping friends; seeking attention appropriately; and introducing and maintaining relevant and appropriate topics of conversation. It has not been necessary to implement behavior modification strategies for B.A.

4. Moving About and Manipulating Objects - **No problems** observed in this domain; functioning appears age-appropriate.

-8-

5.  Caring for Herself - B.A. has a **"very serious problem in this area."**  B.A. has a "slight problem" being patient when necessary; cooperation in, or being responsible for, taking needed medications; using good judgment regarding personal safety and dangerous circumstances; and using appropriate coping skills to meet daily demands of school environment.  B.A. has a "serious problem" identifying and appropriately asserting emotional needs; responding appropriately to changes in own mood.  B.A. has a "very serious problem" taking care of personal hygiene; caring for physical needs (e.g. dressing, eating); and knowing when to ask for help.

6.  Medical Conditions and medications - B.A. will miss occasionally due to heavy menstrual cycles.

(Tr. 176-181)(emphasis added).

The record reflects reports from DaySpring dated December 9, 2009, January 5, 2010, February 9, 2010, and March 19, 2010.  (Tr. 409-410, 412-413, 420-423).  As of March 19, 2010, B.A.'s diagnosis was:

| | |
|---|---|
| Axis I: | Dysthymic Disorder |
| | Sexual Abuse of Child - focus on victim |
| Axis II: | No diagnosis |
| Axis III: | General Medical Conditions |
| Axis IV: | Primary support group, social, education, other psychosocial and environmental Problems |
| Axis V: | GAF Score - 53 |

(Tr. 409).

On April 29, 2010, Joyce Parker, MHPP of DaySpring, who reported she had been seeing B.A. since November 6, 2007, three to four times a month, completed a SSI Child's Medical/Functional Assessment.  (Tr. 404-406).  In the assessment, Ms. Parker diagnosed B.A. with Dysthymic Disorder and reported "Chronic conflict in home, anxiety, depression reported by parents."  (Tr. 404).  She reported that no functional limitations were observed.  Ms. Parker also stated as follows:

The severely dysfunctional and chaotic family dynamics contributes to her symptoms.

-9-

> One parent's mental illness symptoms is a major factor and the other parent's permissive parenting style contributes to the dysfunction.

(Tr. 404). Ms. Parker reported that B.A. was in school - regular - grade appropriate, and that it was unknown whether B.A. had one extreme limitation or two marked limitations in any area of physical or mental function. (Tr. 405). She believed those questions needed to come from the school, and stated that her agency did not provide IQ testing. However, Ms. Parker continued to report that based on B.A.'s self report and grades, there was **no limitation** in B.A.'s learning; that B.A. had **moderate limitation** in interacting and relating (noting that B.A. often conflicted with siblings within the family unit and had poor interpersonal skills); that B.A. had **no limitation** in moving about and manipulating objects; and that in caring for herself, B.A. had **marked limitation** - poor hygiene (noting that she had "lice chronically, environmental issues"). (Tr. 406)(emphasis added). Ms. Parker concluded that B.A. was not severely impaired compared with a normal child of the same age, and that she would "function better if the whole family functioned better. She functions appropriately in other environments, school and community." (Tr. 406).

B.A. met with a "Dr. Z" at DaySpring on April 29, 2010, and it was noted that she was dealing with a mother and step-father getting close to divorce and her boyfriend getting arrested for running away. Dr. Z reported that her medicine was working fairly but that it would probably need to be raised for a short time while B.A. processed the bad things going on in her life. (Tr. 408).

In a September 4, 2008 Function Report - Child Age 12 to 18th Birthday, it was reported by Plaintiff that B.A. had no limitation in her process in understanding and using what she had

-10-

learned, but her mother reported that B.A. could not tell time, understand money, could not make correct change, and could not understand, carry out, and remember simple instructions.  (Tr. 146).  Plaintiff also reported that B.A. could not make new friends, did not generally get along with her parents or other adults, could not generally get along with her siblings, and could not play team sports.  (Tr. 147).  Plaintiff reported that the "Child is ADHD and has a composive[sic] disorder." (Tr. 150).  In a Disability Report - Appeal dated March 25, 2009, Plaintiff reported that B.A. "Have troble learing and consertaing [sic] in school and at home." (Tr. 164).

At the hearing held on April 27, 2010, B.A. testified that she was in 8th grade in regular classes and was receiving F's.  (Tr. 39).  She stated she had been having trouble concentrating and tried to keep up, but could not.  She stated she had trouble understanding, that it was really difficult for her, and she was afraid she would not pass.  (Tr. 39).  She reported having two friends in school whom she had known since fifth grade, and had a boyfriend, who visited her on weekends.  (Tr. 40-41).  She reported having special education classes in the seventh grade. (Tr. 42).  Plaintiff testified that B.A. was switched from Pinkston school to Mountain Home Junior High and that the junior high did not have a "Team three" which was what B.A. was in. She testified that she was told B.A.'s grades were not low enough for her to qualify for special education classes.  (Tr. 44).  Plaintiff reported that B.A. was getting counseling now at DaySpring, going twice a week, and that they were going to start family counseling as well.  (Tr. 45).  She testified that B.A. was on Lexapro for compulsive disorder, Trazodone for sleep and Focalin for ADD.  (Tr. 46).  She testified that B.A.'s boyfriend came to their home every other weekend and stayed the night, sleeping in her son's room, and that B.A. met him when they were

-11-

in counseling together.  (Tr. 47).  Plaintiff stated that B.A. and her 16 year old sibling fought a

lot, that her 16 year old was bipolar, and had a 10 month old baby that she was helping to raise.

(Tr. 47-60).  Plaintiff also testified that when B.A. was little, she hit her head on a trash can and

chipped her skull, requiring four stitches.  (Tr. 52).  Plaintiff testified that B.A. got frustrated,

angry, and down when she could not understand something.  (Tr. 54).  She stated that the

Lexapro and Trazodone helped B.A. with sleep.  (Tr. 55).  Plaintiff testified that there were four

children in the house at that time, the boy was on SSI, a daughter Chantell had applied for SSI,

and that all four children in the home had ADD.  (Tr. 57).

## III.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by

substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir.

2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind

would find it adequate to support the Commissioner's decision.   The ALJ's decision must be

affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d

964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the

Commissioner's decision, the Court may not reverse it simply because substantial evidence exists

in the record that would have supported a contrary outcome, or because the Court would have

decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other

words, if after reviewing the record it is possible to draw two inconsistent positions from the

evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ

must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

The regulations prescribe a three-step process for making the disability determination.

First, the ALJ must determine whether the child has engaged in substantial gainful activity.  See

20 C.F.R. 416.924(b).   Second, the ALJ must determine whether the child has a severe

impairment or combination of impairments.  See 20 C.F.R. 416.924(c).  Third, the ALJ must

determine whether the severe impairment(s) meets, medically equals, or functionally equals a

listed impairment.  See 20 C.F.R. § 416.924(d).   In the present case, the ALJ found that B.A.'s

claim failed at step three, as B.A. did not have an impairment that met or medically or

functionally equaled a listed impairment.  The ALJ specifically considered the Listing in 112.02,

112.04, 112.05 or 112.11 when making this determination.  20 C.F.R. Pt. 404, Subpt. P, App.

The Court finds there is substantial evidence in the record to support the ALJ's

determination that B.A.'s impairments did not meet or medically equal in severity any listed

impairment.  See 20 C.F.R. Part 404, Subpt. P, App. 1, Part B.  The Court next addresses

whether B.A.'s impairments are functionally equal to any listed impairment, or, in other words,

whether "what [B.A.] cannot do because of [her] impairments . . . is functionally equivalent in

severity to any listed impairment that includes disabling functional limitations in its criteria."

20 C.F.R. § 416.926a(a).  Functional equivalence may be established by demonstrating marked

limitations in two, or extreme limitations[1] in one of the following "domains:"  1) acquiring and

---

[1]((2)Marked limitation -(I)We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.... (3)Extreme limitation - (I) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  "Extreme" limitation also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

AO72A
(Rev. 8/82)

using information;  2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for yourself;  and 6) health and physical well-being.  See 20 C.F.R. § § 416.926(b)(1), 416.926a(d).  The ALJ should consider all relevant evidence in the case to determine whether a child is disabled, and the evidence may come from acceptable medical sources and from a wide variety of "other sources," including teachers.  SSR 09-2P.  In fact, the Commissioner's regulations for childhood disabilities "provide that parents and teachers, as well as medical providers, are important sources of information."  Lawson v. Astrue, 2009 WL 2143754, at *9 (E.D. Mo. July 13, 2009), citing 20 C.F.R. § 416.9249.

IV.    **Arguments of the Parties:**

Plaintiff raises three points of error: 1)  that the ALJ erred in finding that B.A. has less than a marked limitation in acquiring and using information and no limitation in the ability to care for herself; 2) that the ALJ erred in her determination that B.A. and Plaintiff were not credible by not giving specific substantial reasons based upon relevant objective medical evidence or established facts and in not following the requirements of Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); and 3) that the ALJ erred in dismissing the report of Dr. Vann Smith.  (Doc. 8).

V.    **Discussion**:

A. **Weight Given to Vann Smith's Opinion:**

The ALJ considered the statements and opinions of Dr. Smith in accordance with SSR 06-3p, and gave it little weight "because they are unsupported by other verifiable objective

------

20 C.F.R. § § 416.926a(e)(2) and (3).

medical evidence of record and are expressed by a consultative examiner who is not the claimant's treating physician." (Tr. 16). The ALJ noted that at least part of Dr. Smith's analysis was based on Plaintiff's reports of B.A.'s medical history, particularly as it related to a history of head trauma, "which is not documented in the medical evidence of record." The ALJ concluded that since Dr. Smith clearly indicated the trauma was part of the basis for his findings and assessment, it was appropriate that his opinion be weighted accordingly.

The Court notes that by Order of the Appeals Council, medical records from Mercy Medical Center dated 9/4/1995-9/29/2001 were made a part of the record. These records relate to B.A.'s birth, and the head injury B.A. sustained in 2001, when B.A. fell into the dumpster. In the Notice of Appeals Council Action, the Council stated that it "considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 2).

The records relating to B.A.'s head injury reveal that B.A. was never diagnosed with a concussion, contrary to Dr. Smith's diagnosis. In addition, Dr. Smith only examined B.A. one time, and his conclusions are inconsistent with other evidence in the record. A CT of B.A.'s head after the fall revealed only some slight soft tissue swelling of the scalp in the left posterior parietal region and no acute intracranial abnormality, a left posterior parietal scalp contusion, and no fracture. (Tr. 443). There was no loss of consciousness, there was no vomiting or changes in speech, behavior, or balance. (Tr. 444). B.A.'s wound was closed with sutures and B.A. appeared to have good movement of the muscles in the forehead and eyebrow with normal sensation. (Tr. 446). Although this evidence was included in the evidence considered by the

-15-

ALJ (Tr. 443-446), indicating that the ALJ did, in fact, have medical evidence of Plaintiff's head injury, the Court nevertheless believes that the medical evidence does not indicate a severe head injury.  Furthermore, the only other really new evidence is the record of B.A.'s birth, which the Court believes is not significant to the ALJ's decision.

Courts have affirmed decisions in which one-time examination reports from Dr. Vann Smith were accorded little weight. See Hudson v. Barnhart, 2005 WL 1560249, *1 (8th Cir. Jul. 6, 2005)("The ALJ gave good reasons for his resolution of the conflict between the mental RFC opinion of Dr. Smith versus those of consulting psychologist Paul Iles and the agency reviewing psychologists").  In Clement v. Barnhart, 2006 WL 1736629 (8th Cir. June 26, 2006), the Eighth Circuit concluded that the ALJ properly discounted the RFC assessment in Dr. Smith's report "after finding it was not supported by his own testing and evaluation, or by other medical evidence in the record, and was inconsistent with Clement's reported daily activities." Id. at *1. District Courts in the Western District of Arkansas have affirmed the ALJ decisions which accorded little weight to Dr. Vann Smith's opinions. See Cole v. Astrue, 2009 WL 3158209, *8 (W.D.Ark. Sept. 29, 2009)(holding that Dr. Smith's opinion was inconsistent with the remaining medical evidence of record);  Partee v. Astrue, 2009 WL 2987398, *1 (W.D. Ark. Sept. 14, 2009)(holding that the ALJ clearly recited the evidence of record and why he gave more weight to the findings of Dr. Bunting over that of Dr. Smith);  Haarstad v. Astrue, 2009 WL 2324711, *5 (W.D. Ark. July 27, 2009).  The court in Cole also found that the ALJ was not biased against Dr. Smith, but merely pointed out the "inconsistencies within Dr. Smith's assessment and the inconsistencies between Dr. Smith's assessment and the other medical evidence of record." 2009 WL 3158209 at *8, n.1. but merely pointed out the "inconsistencies within Dr. Smith's

-16-

assessment and the inconsistencies between Dr. Smith's assessment and the other medical evidence of record."  2009 WL 3158209 at *8, n.1.  The undersigned is of the opinion that the ALJ merely pointed out the "inconsistencies within Dr. Smith's assessment and the inconsistencies between Dr. Smith's assessment and the other medical evidence of record."  Id.

The Court finds there is substantial evidence to support the ALJ's decision to give Dr. Smith's opinion little weight.

**B.  Domains:**

**1.  Acquiring and Using Information:**

The ALJ found that B.A. had less than a marked limitation in this domain. The ALJ further noted that the fact that on Arkansas Benchmark Exams taken prior to the 2008-2009 school year B.A. had scored below the basic math level, yet was at grade level in math as reflected in her school report on October 21, 2008, suggested that B.A.'s ability in math was improving.  (Tr. 171-173, 279). While in the 7th grade, B.A. made grades ranging from "A" to "D", the majority falling in the "C" range.  There are no school records reflecting B.A.'s 8th grade grades.

Teacher Childress found that B.A. had only a **"slight problem"** in understanding and participating in class discussions and providing organized oral explanations and adequate descriptions.  Although Dr. Bunting found B.A. met the criteria for reading and math disorder, since she was only functioning at the 4th grade level, she also found that B.A. communicated and interacted in an age appropriate manner, had the capacity to cope with typical mental/cognitive demands of school tasks when taking her medications, was able to attend and sustain her

-17-

concentration in the testing session and interview, was able to persist in the structured, supervised testing situation when on her medication, and appeared able to complete work like tasks within an acceptable time frame.  Dr. Whaley found that B.A. had **"Less than marked"** limitation in this area.  Although Teacher Damby indicated that B.A.'s current reading and written language level was 6th grade, she found her to have **no problems** in this domain.  B.A. testified at the hearing that she was making F's at school.  However, Ms. Parker found that based on self report and grades, B.A. had no limitation.

The Court finds there is substantial evidence to support the ALJ's finding that B.A. had a less than marked limitation in acquiring and using information.

### 2.  Attending and Completing Tasks:

The ALJ found that B.A. had no limitation in attending and completing tasks.  She noted that although Plaintiff alleged that B.A. was unable to complete homework in a timely manner, B.A.'s teachers reported observing no problems in this domain.  Teacher Childress observed **no problems** in this domain.  Dr. Bunting found B.A.'s concentration was adequate for the testing situation and that her pace was within normal limits.  Dr. Whaley found B.A. had **"Less than Marked"** limitation in this domain.  Teacher Damby observed **no problems** in this domain.

The Court finds there is substantial evidence to support the ALJ's finding that B.A. had a less than marked limitation in attending and completing tasks.

### 3.  Interacting and Relating with Others:

The ALJ found that B.A. had **less than marked** limitation in interacting and relating with others.  She noted that one of B.A.'s 7th grade teachers, Teacher Damby, reported that B.A. had

-18-

**"obvious to serious problems"** with playing cooperatively with other children, making and keeping friends, seeking attention appropriately, relating experiences and telling stories, introducing and maintaining relevant and appropriate topics of conversation, and interpreting non-verbal communication.  It is noteworthy that Teacher Damby also reported that it had not been necessary to implement behavior modification strategies for B.A.  In addition, as also noted by the ALJ, Teacher Childress observed **no problems** in this domain, and reported that it had not been necessary to implement behavior modification strategies for B.A.  Dr. Bunting found that B.A. communicated and interacted in an age appropriate manner.  Dr. Whaley found that B.A. had **no limitation** in this domain.  Ms. Parker found that B.A. had a **moderate limitation** in this domain - noting that she conflicted often with her siblings within the family unit, and had poor interpersonal skills.

The Court finds there is substantial evidence to support the ALJ's finding that B.A. had less than marked limitation in interacting and relating with others.

**4.  Moving About and Manipulating Objects**:

The ALJ found that B.A. had no limitation in moving about and manipulating objects. Teacher Childress observed **no problems** in this domain.  Dr. Whaley found B.A. had **no limitations** in this domain.  Teacher Damby observed **no problems** in this domain.  Ms. Parker found **no limitation** in moving about and manipulating objects.  There is no evidence in the record to support finding a limitation in this domain, and the Court finds there is substantial evidence to support the ALJ's finding that B.A. had no limitation in this area of domain.

-19-

### 5. Caring for Yourself:

The ALJ found that B.A. had no limitation in the ability to care for herself. Although Teacher Damby believed B.A. had a **"very serious problem"** in this domain, Teacher Childress found that B.A. had only a **"slight problem"** handling frustration appropriately; taking care of personal hygiene; and caring for physical needs (e.g. dressing, eating). Dr. Bunting reported that B.A. was casually and appropriately groomed and dressed in a red sweat shirt and pants, and that her hygiene and gait were unremarkable. Dr. Whaley found B.A. had **no limitation** in this domain. Ms. Parker believed B.A. to have a **"marked limitation"** in this domain, relating to poor hygiene. She noted that B.A. had lice chronically, due to environmental issues.

The Court believes that based upon the record as a whole, and considering B.A.'s teachers' comments as well as Ms. Parker's comments, that B.A. had more than "no limitation" in this area of domain, but also believes B.A.'s limitation in this area was less than marked. The record shows no physical limitations that would prevent B.A. from caring for herself, and neither B.A. nor Plaintiff alleged B.A. could not care for herself. The Court does not believe that B.A. had no limitation in this area of domain, but does find there is substantial evidence to support a finding that B.A. had less than a marked limitation in this area of domain.

### 6. Health and Physical Well-Being:

The ALJ found that B.A. had no limitation in health and physical well-being. The ALJ then discussed the fact that although B.A. has serious limitations in two of the six domains, the record showed that B.A. was able to function adequately with medications and further, "that many of the claimant's symptoms stem from her family living situation." Teacher Childress

stated that he did not know about medication.  Dr. Whaley found **no limitation** in this domain.

Teacher Damby noted that B.A. would miss occasionally due to heavy menstrual cycles, but gave

no limitation.  Ms. Parker concluded that B.A. was not severely impaired compared with a

normal child of the same age, and stated that B.A. would function better if the whole family

functioned better.  She further noted that B.A. functioned appropriately in other environments,

school and community.  The ALJ recognized that Ms. Parker was not a psychologist or

psychiatrist, but believed  "she is in a unique position to evaluate the claimant" since she had

treated B.A. since November 2007.  (Tr. 22).  The ALJ also noted that throughout the course of

B.A.'s mental health treatment, "she has consistently been assigned a global assessment of

functioning (GAF) score of 53 or above."[2] The ALJ recognized that a GAF score was a "snap-

shot" of B.A.'s overall adaptive functioning, but stated that scores consistently above 53

"strongly suggests that the claimant is experiencing only moderate symptoms."

      In the November 6, 2007, DaySpring Comprehensive Assessment, it was reported that

the Department of Human Services case remained open and that the environment "is still

unsuitable - 7 people in 2 bedroom trailer, there is no space or privacy for any of the kids." (Tr.

237).  It also reports that there remained a risk of B.A. and her siblings going into foster care, and

that was something B.A. expressed as a "constant worry."  It is also noteworthy that in Dr.

Bunting's December 19, 2008 report, she reported that Plaintiff reported no concerns with B.A.

except that because the family moved in November, she had been taken out of her special

education classes.  Dr. Bunting also noted that it did not seem peculiar for B.A. to check to see

---

[2]The Court notes that B.A. received a score of less than 50 (49) shortly after being removed from her home and placed in foster care.  In addition, Dr. Smith gave B.A. a GAF score of 45, but as discussed earlier, little weight is given to his opinion.

-21-

if all the family members were present, in light of the fact that B.A. had just returned from 1 ½ years in foster care. Finally, Ms. Parker reported that B.A.'s "severely dysfunctional and chaotic family dynamics contributes to her symptoms." She further stated that one of B.A.'s parent's mental illness symptoms was a major factor and the other parent's permissive parenting style contributed to the dysfunction. She concluded that "B.A. would function better if the whole family functioned better. She functions appropriately in other environments, school and community." In addition, in April of 2010, B.A. was dealing with her mother and step-father getting close to divorcing and her boyfriend was being arrested for running away. Dr. Z felt that B.A. would need to increase the dosage of her medication in order to get her through that difficult time.

The Court finds that the record as a whole supports the ALJ's conclusion that many of the claimant's symptoms stem from her family living situation, and that B.A. functions much better when not in that environment. Accordingly, the Court finds there is sufficient evidence to support the ALJ's finding that B.A. was able to function adequately with medications and while outside her unstable, dysfunctional home environment, and therefore had no limitation in this area of domain..

**C.    ALJ's Credibility Findings:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) B.A.'s daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not

-22-

discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In this case, the ALJ noted that B.A.'s mother alleged that as a result of B.A.'s mental impairments, B.A. had difficulty learning and concentrating, that B.A. was unable to tell time, make correct change, make new friends, get along with family members or other adults, complete homework in a timely manner, complete household chores, or understand, carry out, and remember simple instructions.  The ALJ noted that throughout the course of B.A.'s mental health treatment, she was consistently assigned a GAF score of 53 or above.  The ALJ also stated that she considered Plaintiff's testimony and statements in regard to B.A.'s alleged limitation, and found that while B.A. did have serious limitations, the evidence did not support Plaintiff's allegations of disabling impairments.

The ALJ considered the school records, including teacher responses to questionnaires, and the various findings of both the consultative examiners as well as non-examining specialists, which contradicted Plaintiff's allegations of B.A.'s disabling limitations.  For example, Dr. Bunting observed that B.A. was appropriately groomed, that her mood was pleasant, her train of thought was logical and goal directed, she was able to follow directions, she was alert, attentive, and cooperative, her level of effort on the tests was good as was her persistence, her concentration was adequate for the testing situations, her pace was within normal limits, and that she communicated and interacted in an age appropriate manner.

-23-

The Court finds that the ALJ properly considered Plaintiff's complaints of B.A. impairments, and that there was substantial evidence to support the ALJ's assessment of Plaintiff's credibility.

## IV. Conclusion

Based upon the foregoing, the Court hereby finds, after considering all the relevant evidence in the record, that there is substantial evidence to support the  ALJ's findings and conclusions.  Accordingly, the Court hereby affirms the ALJ's decision and dismisses Plaintiff's case with prejudice.

IT IS SO ORDERED this 5th day of March, 2012.


/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-24-